IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CSL BEHRING, LLC, </br></br>*Plaintiff*, </br></br> v. </br></br> BAYER HEALTHCARE, LLC, </br></br> *Defendant*. | Civ. No. 18-170-RGA |

**MEMORANDUM**

Plaintiff CSL Behring and Defendant Bayer Healthcare are competitors in the market for recombinant Factor VIII, a human blood factor used to treat hemophilia A patients. They are parties to a Supply and License Agreement (the "Supply Agreement") (D.I. 32-1) that memorializes Bayer's obligation to supply CSL with recombinant Factor VIII. The parties have asserted claims and counterclaims against each other for breach of the Supply Agreement and other related torts. Currently pending before the court is CSL's Motion to Dismiss Counts Two and Three of Bayer's Counterclaims and Bayer's Request for Attorneys' Fees. (D.I. 31). The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a). For the reasons discussed below, CSL's motion to dismiss is granted in part and dismissed in part.

I. **BACKGROUND**

   **A. The Parties' Relationship**

The Supply Agreement is governed by New York law and terminated by its own terms on December 31, 2017. (D.I. 32-1 at §§ 7.1, 11.2). Under the Supply Agreement, Bayer agreed to manufacture and supply CSL with two human recombinant Factor VIII products that CSL sold under the trade names "Helixate" and "Iblias." (D.I. 27, Counterclaims at ¶¶ 7-8). Bayer concurrently made and sold the same products for itself under the trade names "Kogenate" and "Kovaltry." (*Id.*). In May 2016, CSL obtained FDA approval of its own human recombinant Factor VIII product that competes with Helixate and is sold under the trade name "Afstyla." (*Id.* at ¶¶ 34, 68).

   **B. Relevant Terms of the Supply Agreement**

The counterclaims that CSL seeks to dismiss essentially allege that CSL was obligated to purchase and sell as much Helixate as the market would buy. The Supply Agreement contains two provisions relevant to these claims. First, there is a "minimum purchase obligation," found in Section 2.2.3.2 of the Supply Agreement, which states: "For Calendar Year 2011 and beyond, CSL's minimum purchase obligation will be sixty percent (60%) of the previous Calendar Year's actual purchase." (D.I. 32-1 at § 2.2.3.2). Second, there is a mechanism set forth in Section 2.3.1 by which CSL provides Bayer, on a monthly basis, rolling forecasts that govern CSL's future orders. (*Id.* at § 2.3.1). The first three months of each forecast are considered a "firm order." (*Id.*). The second three months (i.e., months four through six) cannot change by more than 15% when those months become firm orders. (*Id.*). Specifically, Section 2.3.1 states, in relevant part:

> CSL shall provide Bayer with a rolling twelve (12) month forecast of its requirements of Product broken down by calendar months. .... The first three (3) calendar months of this forecast shall represent a firm order .... The second

2

> three (3) calendar months of this forecast may not change more than plus or minus fifteen percent (15%) from the immediately preceding twelve (12) month forecast when the second three (3) months of the immediately preceding forecast are upgraded to the status of a firm order.

(*Id.*).

Finally, Bayer has requested attorneys' fees in its Prayer for Relief. (D.I. 27 at 37). Section 9.1 of the Supply Agreement governs attorneys' fees and provides, at least in some circumstances, that a prevailing party is entitled to recover its litigation costs if the litigation involves a request for equitable relief. Specifically, Section 9.1 states:

> Except in cases where a party seeks equitable relief in a court of competent jurisdiction to avoid irreparable injury, the parties hereto shall first attempt to settle by good faith negotiation any dispute, controversy or claim arising out of or relating to this Agreement ("Dispute"). In the event that a party seeks such equitable relief, the prevailing party shall be entitled to recover from the non-prevailing party all reasonable out-of-pocket costs and expenses incurred in such litigation.

(D.I. 32-1 at § 9.1).

## II. STANDARD OF REVIEW

Under Rule 12(b)(6), a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive the motion to dismiss, the complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Twombly*, 550 U.S. at 555. In assessing the plausibility of a claim, the court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002). The court's review is

limited to the allegations in the complaint, exhibits attached to the complaint, documents incorporated by reference, items subject to judicial notice, and matters of the public record. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III. DISCUSSION

CSL has moved to dismiss Counts 2 and 3 of Bayer's counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing, respectively. CSL has also moved to dismiss Bayer's request for attorneys' fees in the Prayer for Relief. Each claim is addressed in turn.

### A. Count 2: Breach of Contract

Count 2 of the counterclaims, for breach of contract, is based on Bayer's assertion that the Supply Agreement is a "requirements contract" within the meaning of UCC Section 2-306. CSL has moved to dismiss on the grounds that the Supply Agreement is not a requirements contract. (D.I. 32 at 7-12).

It is well established that, "Under a requirements contract, the buyer must purchase all of its needs for a particular product during a particular period exclusively from the seller." *Scantibodies Lab., Inc. v. Church & Dwight Co.*, 2018 WL 4500852, at *3 (S.D.N.Y. Sept. 19, 2018), *appeal docketed*, No. 18-3723 (2d Cir. Dec. 13, 2018); *see also MDC Corp., Inc. v. John H. Harland Co.*, 228 F. Supp. 2d 387, 392 (S.D.N.Y. 2002) (stating that "a requirements contract obligates the buyer to buy exclusively from a particular supplier"); *Abrasive-Tool Corp. v. Cystic Fibrosis Found.*, 1991 WL 97445, at *4 (W.D.N.Y. May 6, 1991) ("A requirements contract exists where the buyer agrees to purchase his requirements 'exclusively from the other party to the contract.'" (internal punctuation omitted) (quoting *Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F. Supp. 187, 192 (E.D.N.Y. 1986))). Absent a promise of exclusivity, "the agreement is 'an

4

indefinite quantities contract, where without more, the buyer's promise is illusory and the contract unenforceable against the seller.'"[1] *Embedded Moments*, 648 F. Supp. at 192 n. 3 (quoting *Mason v. United States*, 615 F.2d 1343, 1346 n. 5 (Ct. Cl. 1980)).

A promise of exclusivity can be express or implied. *Scantibodies Lab.*, 2018 WL 4500852, at *3. Here, the Supply Agreement is not a requirements contract, because no language in the Supply Agreement states or implies that CSL must purchase all of its requirements exclusively from Bayer. Bayer points to use of the word "requirements" in Section 2.3.1 of the Supply Agreement, which states that CSL must "provide Bayer with a rolling twelve (12) month forecast of its requirements of Product." (D.I. 35 at 11). But "use of the word 'requirements' in a contract is not enough" to establish the necessary exclusivity. 1 White, Summers, & Hillman, Uniform Commercial Code § 4:20, at 335 (6th ed. 2012). The word "'requirements' is not a term of art, and it can mean either 'all needed, or, all desired from the seller.'"[2] *Id*.

Bayer also relies on statements and actions extraneous to the contract—such as statements CSL made during the course of this litigation and the fact that Bayer is the only manufacturer of

---

[1] To be enforceable, a contract needs to provide either an exact quantity of goods or "specify a mode or formula for calculation." 1 White, Summers, & Hillman, Uniform Commercial Code § 4:20, at 335 (6th ed. 2012). Requirements contracts arise where a buyer cannot precisely forecast its needs at the time of contracting. *Scantibodies Lab.*, 2018 WL 4500852, at *3. In those circumstances, the promise of exclusivity provides the mutuality of obligation necessary to make the agreement an enforceable contract. *Embedded Moments*, 648 F. Supp. at 192 n. 3. "[T]he requisite mutuality and consideration for a valid contract is found in the legal detriment incurred by the buyer in relinquishing his right to purchase from all others except from the seller." *Scantibodies Lab.*, 2018 WL 4500852, at *3 (quoting *RBC Aircraft Prods., Inc. v. Precise Machining & Mfg., LLC*, 26 F. Supp. 3d 156, 180 (D. Conn. 2014)).

[2] To connote exclusivity, requirement contracts often use the phrase "all requirements." *See, e.g., XO Commc'ns, LLC v. Level 3 Commc'ns, Inc.*, 948 A.2d 1111, 1116 (Del. Ch. 2007) (applying New York law).

5

Helixate—to argue that there is an implied promise of exclusivity. (D.I. 35 at 12-13). But New York courts considering whether there was an express or implied promise of exclusivity have constrained themselves to the four corners of the agreement. *See, e.g., Scantibodies Lab.*, 2018 WL 4500852, at *3-4 (finding that contract was not a requirements contract because "no language in the Agreements states or implies that [defendant] must purchase [goods] exclusively from [plaintiff]"); *Townsend Oil Corp. v Marini*, 77 A.D.3d 1416, 1416–17 (N.Y. App. Div. 2010) (stating that "the agreement is not a requirements agreement within the meaning of UCC 2-306 inasmuch as it is not exclusive on its face"). This is consistent with principles of contract interpretation. Where an agreement "is clear and unambiguous on its face, the parties' intent must be construed from the four corners of the agreement, and not from extrinsic evidence." *Schonfeld v. Saucedo*, 73 N.Y.S.3d 208, 210 (N.Y. App. Div. 2018) (quoting *Herzfeld v. Herzfeld*, 857 N.Y.S.2d 170, 171 (N.Y. App. Div. 2008)); *Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957) ("It has long been the rule that when a contract is clear in and of itself, circumstances [ ] extrinsic to the document may not be considered."). In addition, the Supply Agreement specified a method for determining an exact quantity (*see* D.I. 32-1 at §§ 2.2.3.2 & 2.3.1), and states, "No waiver or modification of any of the terms of this Agreement shall be valid unless in writing and signed by authorized representatives of both parties hereto." (*Id.* at § 11.5). Given the foregoing, Bayer may not use extrinsic evidence to rewrite the terms of an unambiguous contract that does not promise exclusivity.

Because the Supply Agreement does not contain CSL's express or implied promise of exclusivity, the agreement is not a requirements contract. Accordingly, count 2 of Bayer's counterclaims, which is premised on the Supply Agreement being a requirements contract, is dismissed for failure to state a claim. Although it is doubtful that Bayer could replead this

counterclaim in a manner that would overcome this deficiency, the counterclaim is dismissed with leave to amend.

### B. Count 3: Implied Covenant of Good Faith and Fair Dealing

Count 3 of Bayer's counterclaims is based on the assertion that the Supply Agreement contains an implied covenant of good faith and fair dealing for CSL to "purchase, market and sell in good faith as much Helixate as the market would buy." (D.I. 27, Counterclaims at ¶ 65). According to the counterclaims, CSL breached this implied covenant in numerous ways, including: (i) by marketing and selling its own competing Factor VIII product, (ii) by refusing to purchase sufficient quantities of Helixate from Bayer to meet the actual market demand in 2016 and 2017, (iii) by attempting to destroy the market for Helixate in 2016 and 2017 in order to create a market for CSL's own competing product, (iv) by reducing the forecasted quantities for three months in 2017 to zero, and (v) by misleading Bayer about why it was not ordering more Helixate. (*Id.* at ¶¶ 66-70).

Under New York law, all contracts contain an implied covenant of good faith and fair dealing in the course of performance. *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002). "This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)). However, "[n]o obligation can be implied ... which would be inconsistent with other terms of the contractual relationship." *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) (quoting *Dalton*, 663 N.E.2d at 296). Put another way, "[a] defendant does not breach its duty of good faith and fair dealing by exercising its rights under the contract." *DCMR v. Trident Precision Mfg.*, 317 F. Supp. 2d 220, 226 (W.D.N.Y. 2004).

Here, CSL had the express right, pursuant to Section 2.2.3.2, to buy no more than its minimum purchase obligation (which was 60% of the previous Calendar Year's actual purchase). (D.I. 32-1 at § 2.2.3.2).[3] According to the allegations in the counterclaim, the existing demand for Helixate was "well in excess of the contractual minimum." (D.I. 27, Counterclaims at ¶ 47). Thus, an implied covenant to market and sell as much Helixate as the market would buy is inconsistent with CSL's express contractual right to buy only the minimum required. Similarly, Bayer cannot base an implied covenant claim on the fact that CSL reduced to zero the forecast for July, August, and September 2017 at the time those months changed from an estimate to a firm order. (*See id.* at ¶¶ 14-17, 69). The Supply Agreement expressly states that the second three months of a forecast cannot change by more than 15% when it is upgraded to a firm order. (D.I. 32-1 at § 2.3.1). "A cause of action for breach of the implied covenant of good faith cannot be based upon a breach of an express contractual provision." *Vladeck, Waldman, Elias & Engelhard, P.C. v. Paramount Leasehold, L.P.*, 2015 WL 1015984, at *11 (N.Y. Sup. Mar. 4, 2015). For all of these reasons, Bayer has failed to state a claim for breach of the implied covenant of good faith and fair dealing. Count 3 of Bayer's counterclaims is dismissed with leave to amend.

### C. Attorneys' Fees

CSL asks the court to dismiss Bayer's request for attorneys' fees in paragraph 4 of the Prayer for Relief. (D.I. 32 at 18). CSL initially argued that there was no authority giving Bayer the right to recover attorneys' fees as "[t]he Supply Agreement does not contain a fee-shifting provision." (*Id.*). There is, however, a provision of the Supply Agreement that shifts attorneys'

---

[3] Count 1 of the counterclaims is for breach of contract in not meeting the 60% minimum purchase obligation. (D.I. 27, Counterclaims at ¶¶ 52-57).

fees in certain circumstances. Section 9.1 of the Supply Agreement provides: "In the event that a party seeks such equitable relief, the prevailing party shall be entitled to recover from the non-prevailing party all reasonable out-of-pocket costs and expenses incurred in such litigation." (D.I. 32-1 at § 9.1). Bayer submits that this provision may apply, because it is seeking equitable relief under the counterclaims. (D.I. 35 at 20). CSL raised new arguments in its reply brief that Section 9.1 does not apply based on its proposed interpretation of the provision and certain facts outside the pleadings. (*See* D.I. 38 at 9-10).

I think it is premature to decide whether attorneys' fees are available as a remedy at this stage of the case. Thus, I will dismiss the motion to dismiss the request for attorneys' fees as premature.

## IV. CONCLUSION

For the foregoing reasons, CSL's motion to dismiss (D.I. 31) is granted in part and dismissed in part. I grant the motion to dismiss Counts 2 and 3 of the counterclaims and dismiss the motion to dismiss the request for attorneys' fees. Counts 2 and 3 are dismissed without prejudice. An appropriate order will be entered.

Dated: January 22, 2019

Richard G. Andrews
UNITED STATES DISTRICT JUDGE