IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| CSL BEHRING, LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civ. No. 18-170-RGA |
| BAYER HEALTHCARE, LLC, | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM**

Plaintiff CSL Behring, LLC and Defendant Bayer Healthcare, LLC are parties to a License and Supply Agreement (the "Supply Agreement") that memorialized Bayer's obligation to supply CSL with recombinant Factor VIII, a human blood factor used to treat hemophilia A patients. Previously, CSL moved to dismiss Counts 2 and 3 of Bayer's counterclaims, which alleged breach of contract under the Uniform Commercial Code ("U.C.C.") and breach of the implied covenant of good faith and fair dealing. (D.I. 31). I granted the motion with leave to amend, and Bayer filed amended counterclaims. (D.I. 69, D.I. 70, D.I. 75). Currently pending before the court is CSL's motion to dismiss the same claims in Bayer's amended counterclaims. (D.I. 77). The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a). For the reasons discussed below, CSL's motion to dismiss the amended counterclaims is granted.

## I. BACKGROUND

### A. The Parties' Relationship

The Supply Agreement is governed by New York law and terminated by its own terms on December 31, 2017. (D.I. 78-1 at §§ 7.1, 11.2). Under the Supply Agreement, Bayer agreed to manufacture and supply CSL with two human recombinant Factor VIII products that CSL sold under the trade names "Helixate" and "Iblias." (D.I. 75 at ¶ 41-44). Bayer concurrently made and sold the same products for itself under the trade names "Kogenate" and "Kovaltry." (*Id.*). In May 2016, CSL obtained FDA approval of its own human recombinant Factor VIII product that competes with Helixate and is sold under the trade name "Afstyla." (*Id.* at ¶ 70).

### B. Relevant Terms of the Supply Agreement

Two provisions in the Supply Agreement govern CSL's purchasing obligations. First, there is a "minimum purchase obligation," found in Section 2.2.3.2 of the Supply Agreement, which states: "For Calendar Year 2011 and beyond, CSL's minimum purchase obligation will be sixty percent (60%) of the previous Calendar Year's actual purchase." (D.I. 78-1 at § 2.2.3.2). Second, there is a mechanism set forth in Section 2.3.1 by which CSL provides Bayer, on a monthly basis, rolling forecasts that govern CSL's future orders. (*Id.* at § 2.3.1). The first three months of each forecast are considered a "firm order." (*Id.*). The second three months (i.e., months four through six) cannot change by more than 15% when those months become firm orders. (*Id.*). Specifically, Section 2.3.1 states, in relevant part:

> CSL shall provide Bayer with a rolling twelve (12) month forecast of its requirements of Product broken down by calendar months. …. The first three (3) calendar months of this forecast shall represent a firm order …. The second three (3) calendar months of this forecast may not change more than plus or minus fifteen percent (15%) from the immediately preceding twelve (12) month forecast when the second three (3) months of the immediately preceding forecast are upgraded to the status of a firm order.

2

## II. STANDARD OF REVIEW

Under Rule 12(b)(6), a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive the motion to dismiss, the complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Twombly*, 550 U.S. at 555. In assessing the plausibility of a claim, the court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002). The court's review is limited to the allegations in the complaint, exhibits attached to the complaint, documents incorporated by reference, items subject to judicial notice, and matters of the public record. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III. DISCUSSION

Bayer asserts amended counterclaims for breach of contract based on U.C.C. § 2-306 (Count 2) and breach of the implied covenant of good faith and fair dealing (Count 3). CSL has moved to dismiss both counts for failure to state a claim pursuant to Rule 12(b)(6). Each count is addressed in turn.

### A. Count 2: Breach of Contract – U.C.C. § 2-306

In Count 2 of the amended counterclaims, Bayer alleges that the Supply Agreement is a "requirements contract" under U.C.C. § 2-306, which CSL breached by failing to order the amount of Helixate that CSL could have sold in calendar year 2017. (D.I. 75 at ¶¶ 107-08). An agreement is not a requirements contract unless it: (1) obligates the buyer to buy the goods exclusively from

3

the seller, and (2) obligates the buyer to buy all of its requirements for goods of a particular kind from the seller. *In re Hawker Beechcraft, Inc.*, 2013 WL 2663193, at *4 (Bankr. S.D.N.Y. June 13, 2013).

I previously dismissed this counterclaim, because Bayer failed to show an express or implied promise of exclusivity. (D.I. 69 at 6). With the amended counterclaims, Bayer tries to establish an express or implied promise primarily through extrinsic evidence, specifically allegations regarding its exclusive manufacturing license and the prior course of dealings between the parties and their predecessors. (D.I. 75, Counterclaims at ¶¶ 12-45). Bayer also tries to establish a promise of exclusivity through intrinsic evidence, specifically terms of the Supply Agreement providing for remedies and quantities. For the reasons described below, neither the extrinsic evidence nor the intrinsic evidence can establish that the Supply Agreement is a requirements contract.

### 1. Extrinsic Evidence

According to Bayer, I am obligated by U.C.C. § 2-202 to consider the extrinsic evidence even if the contract is not ambiguous. (D.I. 82 at 8-14). In general, Section 2-202 provides that the terms of a contract may be supplemented, but not contradicted, by extrinsic evidence related to the parties' course of performance, course of dealing, or usage of trade. Specifically, it states in relevant part:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented (a) by course of performance, course of dealing, or usage of trade (Section 1-303)....

N.Y. U.C.C. § 2-202(a) (emphasis added).

4

Section 2-202, however, bars the use of extrinsic evidence when the contract at issue is fully integrated. An annotation to Section 2-202 states: "Writings which are a complete 'integration' of the parties' agreement may not be supplemented, contradicted, or varied by parol evidence under the Code and the New York cases." New York Annotation 1 to N.Y. U.C.C. § 2-202; *see also W. 63 Empire Assocs., LLC v. Walker & Zanger, Inc.*, 968 N.Y.S.2d 455, 457 (App. Div. 2013) ("[A]n integrated contract precludes extrinsic proof to add to or vary its terms") (citing U.C.C. § 2-202).

Here, the Supply Agreement is an integrated contract. It states: "This Agreement . . . constitute[s] the entire agreement among the parties and supersedes any prior understandings, agreements, or representations by or among the parties, written or oral." (D.I. 78-1 at § 11.9). Courts regularly conclude that written agreements containing an "entire agreement" clause are fully integrated and may not be modified under Section 2-202 by extrinsic evidence. *See GE Packaged Power, Inc. v. Readiness Mgmt. Support, L.C.*, 2007 WL 1970888, at *2 (N.D. Ga. July 3, 2007) (barring admission of extrinsic evidence pursuant to UCC 2-202 because New York contract stating that it was the "entire agreement of the parties" was integrated); *MidAtlantic Nat'l Bank/N. v. Serv. Resource Indus., Inc.*, 1992 WL 400736, at *3 (S.D.N.Y. Dec. 28, 1992) (same); *Creative Interiors v Epelbaum*, 2009 WL 2382986, at *2 (N.Y. Sup. Ct., July 30, 2009) (same). Because the Supply Agreement is a fully integrated contract, Bayer may not use extrinsic evidence, introduced through Section 2-202, to establish that the agreement is a requirements contract.

## 2. Intrinsic Evidence

Bayer argues that Section 7.2.1, which provides that specific performance is the "sole remedy" for a material breach, reflects the parties' understanding that it was a requirements contract. (D.I. 82 at 15-16; D.I. 78-1 at § 7.2.1). A specific performance remedy may be consistent

with the existence of a requirements contract, but it is not a term exclusive to a requirements contract. Indeed, U.C.C. § 2-716 provides a buyer with a right to specific performance "where the goods are unique or in other proper circumstances." N.Y. U.C.C. § 2-716. There is no requirement in Section 2-716, however, that the contract be a requirements contract. Accordingly, a specific performance clause does not by itself establish that the Supply Agreement was a requirements contract.

Bayer also argues that, under New York law, a requirements contract may have, as here, minimum and maximum amounts. D.I. 82 at 16; *see Nat'l Home Products Co. v Union Carbide & Carbon Corp.*, 121 N.Y.S.2d 130, 132 (N.Y.A.D. 1953) (stating that the "fundamental feature" of a requirements contract "was not altered by the specification of minimum and maximum quantities"). But Bayer fails to cite any authority for the proposition that such terms make an agreement a "requirements" contract. Because Bayer has not shown that the terms of the Supply Agreement make it a requirements contract, it fails to state a claim for breach of contract based on Section 2-306 of the UCC. Count 2 is dismissed with prejudice.

### B. Count 3: Implied Covenant of Good Faith and Fair Dealing

Count 3 of Bayer's counterclaims is based on the assertion that the Supply Agreement contains an implied covenant of good faith and fair dealing for CSL to "purchase, market and sell in good faith as much Helixate as the market would buy." (D.I. 27, Counterclaims at ¶ 65). As I explained previously when dismissing the original counterclaim, "[n]o obligation can be implied ... which would be inconsistent with other terms of the contractual relationship." (D.I. 69 at 8 (quoting *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004)). Thus, I dismissed Bayer's original Count 3, because it was "inconsistent with CSL's express contractual right to buy only the minimum required." (*Id.*). In the amended Count 3,

6

Bayer added a new allegation stating that "CSL intentionally breached the implied covenant of good faith and fair dealing by deliberately submitting false and inflated requirements forecasts to Bayer in early 2016 knowing that CSL would substantially decrease the forecasts to its actual requirements later." (D.I. 71, Counterclaims at 117).

Even accepting this allegation as true, Bayer cannot overcome the fact that the Supply Agreement has a provision expressly governing the amounts by which the twelve-month forecast may change. Specifically, Section 2.3.1 provides that the first three calendar months cannot change at all, because they are a "firm order," and the second three calendar months cannot change "more than plus or minus fifteen percent (15%) from the immediately preceding twelve (12) month forecast." (D.I. 78-1 at § 2.3.1). The Supply Agreement does not contain any restrictions on the forecast beyond those first six months. Thus, the parties negotiated and agreed to how many months in a twelve-month forecast would have a binding effect. By agreeing that only the first six months had any binding effect, the parties also agreed that the remaining six months had no binding effect. Bayer essentially asks the court to rewrite Section 2.3.1 so that the last six months of the forecast have some binding effect where there was previously none. New York law, however, "is clear that a court should not, under the guise of the covenant of good faith and fair dealing, rewrite a contract." *State v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 663 (S.D.N.Y. 2017).

A defendant does not violate the implied covenant of good faith and fair dealing "merely by acting in its own self-interest while also performing its express obligations under the contract." *Woodard v. Reliance Worldwide Corp.*, 2019 WL 3288152, at *3 (S.D.N.Y. July 22, 2019) (failing to state a claim for breach of the implied covenant even if defendant intentionally delayed terminating plaintiff's employment so as to avoid paying a bonus owed if he had been terminated earlier); *Hudson Valley Bank, N.A. v Banxcorp*, 2010 WL 3516076, at *9 (N.Y. Sup. Ct., Sep. 7,

2010) (finding no violation of the implied covenant despite bad faith allegations because the agreement "permitted Plaintiff to demand full payment at any time for any reason, or for no reason whatsoever"). Accordingly, Count 3 of the amended counterclaims is dismissed with prejudice, because its implied covenant would impose obligations contrary to CSL's express contractual rights.

## IV. CONCLUSION

For the foregoing reasons, CSL's motion to dismiss (D.I. 77) is granted. Counts 2 and 3 of the amended counterclaims (D.I. 75) are dismissed with prejudice. An appropriate order will be entered.

Dated: September 17, 2019

_____
UNITED STATES DISTRICT JUDGE